**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

JESSICA PARDO and STHORM PYRANE, individually and on behalf of all others similarly situated,

Plaintiff,

v.

Bimbo Bakeries USA, Inc.,

Defendant.

Case No.25-6368

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs Jessica Pardo and Sthorm Pyrane bring this action on behalf of themselves and all others similarly situated by and through their attorneys, Sterlington, PLLC and Don Bivens, PLLC, against Defendant Bimbo Bakeries USA, Inc. Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief except as to the allegations specifically pertaining to themselves which are based on their personal knowledge.

## NATURE OF THE ACTION

1. This is a putative class action brought on behalf of purchasers of Artesano bread products – Artesano Bakery Bread, Artesano Bakery Bread – Hawaiian Bread, Artesano Bakery Bread – Smooth Multigrain, Artesano Bakery Bread – Brioche, and Artesano Bakery Bread – Golden Wheat (collectively the "Products") – sold by Defendant Bimbo Bakeries USA, Inc. through the brand Sara Lee.

2. Each of the Products claim to be "Always baked without artificial colors, flavors & preservatives."

3. This representation is false. The Products do indeed contain a known artificial preservative: citric acid, as stated on the Products' list of ingredients.

4. Defendant's misrepresentation regarding the absence of artificial colors, flavors, or preservatives is plainly featured on the Products' labeling to induce health-conscious consumers to purchase the Products.

5. Defendant has profited unjustly from its deceptive conduct. As such, Plaintiffs assert claims on behalf of themselves and similarly situated purchasers, both nationwide and in New York, for violations of New York General Business Law Sections 349 and 350, breach of express warranty, and unjust enrichment.

**JURISDICTION AND VENUE**

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(a) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000 exclusive of interest and costs, there are over 100 members of the putative class, and at least one class member is a citizen of a state different than Defendant.

7. This Court has personal jurisdiction over Defendant because a substantial portion of the events that gave rise to Plaintiffs' claims occurred in New York.

8. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial portion of the events that gave rise to Plaintiffs' claims occurred in this District.

**PARTIES**

9. Plaintiff Jessica Pardo is a citizen of New York who resides in Queens, New York. Over the past three years, Ms. Pardo has purchased the Products for her household several times a month, both in person and online, from merchants including BJ's Wholesale, Costco, Amazon Fresh, and ShopRite. Each time she purchased the Product, Ms. Pardo relied on Defendant's false, misleading, and deceptive marketing stating that it was "Always baked without artificial colors, flavors & preservatives" which Ms. Pardo understood to mean that there were no artificial

preservatives in the Products. Ms. Pardo became aware that artificial citric acid was used as a preservative in the Products in September 2025.

10. Plaintiff Sthorm Pyrame is a citizen of New York who resides in Brooklyn, New York. Ms. Pyrame has purchased the Products for herself and her household several times a month, primarily in person, from merchants including Stop & Shop, Food Bazaar, and BJ's Wholesale. Each time she purchased the Product, Ms. Pyrame relied on Defendant's false, misleading, and deceptive marketing stating that it was "Always baked without artificial colors, flavors & preservatives" which Ms. Pyrame understood to mean that there were no artificial preservatives in the Product. Ms. Pyrame became aware that artificial citric acid was used as a preservative in the Products in September 2025.

11. Defendant Bimbo Bakeries USA, Inc. is a corporation organized under the laws of Delaware with its principal place of business in Horsham, Pennsylvania. Defendant formulates, advertises, manufactures, and/or sells the Products throughout New York and the United States.

## GENERAL ALLEGATIONS

### A. Defendant Represents That the Products are "Always Baked Without Artificial Colors, Flavors & Preservatives."

12. Each of the Products is advertised by the Defendant as "Always baked without artificial colors, flavors & preservatives." On the Products themselves, this misrepresentation is found in a prominently featured round red badge displayed on the front and bottom of the Product's packaging:



13. The red badge can be seen in the images below of Artesano Bakery Bread (“Bakery Bread”), Artesano Bakery Bread – Hawaiian Bread (“Hawaiian Bread”), Artesano Bakery Bread – Smooth Multigrain (“Multigrain Bread”), Artesano Bakery Bread – Brioche (“Brioche Bread”), and Artesano Bakery Bread – Golden Wheat (“Golden Wheat Bread”).

a. Bakery Bread:



b. Hawaiian Bread:



c. Multigrain Bread:



d. Brioche Bread:



e. Golden Wheat Bread:



14. The "Always baked without artificial colors, flavors & preservatives" misrepresentation also appears in advertising for the products. For example:






15. "Always Baked Without Artificial Colors, Flavors & Preservatives" leads reasonable consumers to believe the Products are free from artificial preservatives. However, each of the Products contains citric acid, a known artificial chemical preservative, as an ingredient as shown below in small print.

a. Bakery Bread:




Sara Lee
Sara Lee, The Original Artisano Bakery Bread

NET WT 1 LB 4 OZ (567g)
007294561241

| Nutrition | Ingredients | Allergens | About this Product | Company, Brand & Sustainability |
|---|---|---|---|---|

Enriched Wheat Flour
- Flour
- Malted Barley Flour
- Reduced Iron
- Niacin
- Thiamin Mononitrate (Vitamin B1)
- Riboflavin (Vitamin B2)
- Folic Acid

Water
Sugar
Yeast
Vegetable Oil (Soybean)
Wheat Gluten
Sea Salt

Contains 0.5% or less of each of the following:
- Cultured Wheat Flour
- Soy Lecithin
- Citric Acid

b. Hawaiian Bread:

Sara Lee

**Sara Lee, Artesano Bakery Bread Hawaiian Bread**

NEW!



NET WT 1 LB 4 OZ (567g)

072945766068

Nutrition | Ingredients | Allergens | About this Product | Company, Brand & Sustainability

- Enriched Wheat Flour
  - Flour
  - Malted Barley Flour
  - Reduced Iron
  - Niacin
  - Thiamin Mononitrate
  - Riboflavin
  - Folic Acid
- Water
- Sugar
- Yeast
- Vegetable Oil (Soybean)
- Wheat Gluten
- Sea Salt
- Natural Flavor
- Potato Flakes

Contains 0.5% or less of each of the following:

  - Cultured Wheat Flour
  - Soy Lecithin
  - Citric Acid

c. Multigrain Bread:



d. Brioche Bread:



e. Golden Wheat Bread:



Sara Lee

Sara Lee, Artesano Bakery Bread, Golden Wheat

NET WT 1 LB 4 OZ (567g)

072945612501

Nutrition | Ingredients | Allergens | About this Product | Company, Brand & Sustainability

Enriched Wheat Flour

- Flour
- Malted Barley Flour
- Reduced Iron
- Niacin
- Thiamin Mononitrate (Vitamin B1)
- Riboflavin (Vitamin B2)
- Folic Acid

Water

Whole Wheat Flour

Sugar

Wheat Gluten

Yeast

Vegetable Oil (Soybean)

Sea Salt

Honey

Wheat Bran

Contains 0.5% or less of each of the following:

- Cultured Wheat Flour
- Soy Lecithin
- Natural Flavor
- Citric Acid

**B. Citric Acid Is a Preservative.**

16. Federal regulations define a preservative as "any chemical that, when added to food, tends to prevent or retard deterioration[.]" 21 C.F.R. § 101.22(a)(5) (2024).

17. The FDA classifies food preservatives into two main groups: antioxidants and antimicrobials. *See Types of Food Ingredients*, U.S. Food & Drug Admin. (July 6, 2023), https://www.fda.gov/food/food-additives-and-gras-ingredients-information-consumers/types-food-ingredients (explaining that preservatives "[p]revent food spoilage from bacteria, molds, fungi, or yeast (antimicrobials); slow or prevent changes in color, flavor, or texture and delay rancidity (antioxidants); maintain freshness") (emphasis added).

18. Citric acid has both antioxidant and antimicrobial properties.

19. Citric acid functions as an antioxidant in two primary ways. *See* Kyoung Mi Moon et al., *Recent Trends in Controlling the Enzymatic Browning of Fruit and Vegetable Products*, National Library of Medicine (Jun. 15, 2020), https://pmc.ncbi.nlm.nih.gov/articles/PMC7355983/.

20. First, citric acid inhibits enzymes that naturally occur in food products – such as those that catalyze oxidation and browning when fruit is sliced – by lowering the pH and thereby reducing the enzymes' activity. Moon *et al.*, *supra* ("Acidifying agents, such as citric acid, ascorbic acid, and glutathione can inactivate [polyphenol oxidases] by lowering the pH."). This inhibition slows oxidative reactions and helps preserve the food.

21. Second, citric acid acts as a chelating agent, binding trace metal ions that would otherwise catalyze oxidation, which further stabilizes and preserves food products. Moon *et al.*, *supra* ("Copper-chelating agents, such as citric and oxalic acids are able to suppress [polyphenol oxidases] activity by binding to metal cofactors in the PPO enzyme structure."); Colin McCarthy and Eric Decker, *Metal Chelators as Antioxidants*, American Oil Chemists' Society (Aug. 10, 2022), https://www.aocs.org/resource/metal-chelators-as-antioxidants/.

22. Citric acid's antimicrobial properties inhibit the growth of certain bacteria, yeasts, and molds. *See* U.S. Food & Drug Admin, *Substances Added to Food: CITRIC ACID* (Feb. 13, 2025), https://www.hfpappexternal.fda.gov/scripts/fdcc/index.cfm?set=FoodSubstances&id=CITRICACID; L. Su *et al.*, *Study on the Antimicrobial Properties of Citrate-Based Biodegradable Polymers*, Frontiers in Bioengineering and Biotechnology 2, 23 (July 2, 2014), https://doi.org/10.3389/fbioe.2014.00023; Khemmapas Treesuwan *et al.*, *Antimicrobial Mechanism of Salt/Acid Solution on Microorganisms Isolated from Trimmed Young Coconut*, *Microorganisms*, https://www.mdpi.com/2076-2607/11/4/873.

23. For example, as to bacteria, citric acid penetrates the cells and lowers the pH inside, interfering with the cells' normal functions. Research has shown citric acid to be effective against harmful microbes in many foods, such as meat, poultry, fruits, and vegetables. *See* Ewelina Książek, *Citric Acid: Properties, Microbial Production, and Applications in Industries, National Library of Medicine*, (Dec. 19, 2023) https://pmc.ncbi.nlm.nih.gov/articles/PMC10779990/#:~:text=Citric%20acid%20finds%20broad%20applications,niger%20and%20yeast%20Yarrowia%20lipolytica.

24. For all these reasons, the FDA identifies citric acid as a preservative. On the FDA's consumer guidance page "Types of Food Ingredients," the FDA lists citric acid among common food preservative ingredients.

U.S. FOOD & DRUG
ADMINISTRATION

Home / Food / Food Ingredients & Packaging / Food Additives and GRAS Ingredients - Information for Consumers / Types of Food Ingredients

# Types of Food Ingredients

**Food Additives and GRAS Ingredients - Information for Consumers**

Understanding How the FDA Regulates Food Additives and GRAS Ingredients

Types of Food Ingredients

Food manufacturers are required to list all ingredients in the food, unless ingredients are subject to an exemption from this requirement such as incidental additives. On a product label, the ingredients are listed in descending order of predominance by weight, with the ingredients used in the greatest amount first, followed by those in smaller amounts. The label must list the names of any FDA-certified color additives (for example, FD&C Blue No. 1 or the abbreviated name, Blue 1), but some ingredients can be listed collectively as "flavors," "spices," "artificial flavoring," or in the case of color additives exempt from certification, "artificial colors", without naming each one.

Food ingredients must meet the same safety standard regardless of whether they are naturally or artificially derived.

The following table lists the types of common food ingredients, why they are used, and some examples of the names that can be found on product labels. Some additives are used for more than one purpose.

| Types of Ingredients | What They Do | Examples of Uses | Ingredient Names That May Be Found on Product Labels |
|---|---|---|---|
| **Preservatives** | Prevent food spoilage from bacteria, molds, fungi, or yeast (antimicrobials); slow or prevent changes in color, flavor, or texture and delay rancidity (antioxidants); maintain freshness | Fruit sauces and jellies, beverages, baked goods, cured meats, oils and margarines, cereals, dressings, snack foods, fruits and vegetables | Ascorbic acid, citric acid, sodium benzoate, calcium propionate, sodium erythorbate, sodium nitrite, calcium sorbate, potassium sorbate, BHA, BHT, EDTA, tocopherols (Vitamin E) |

*Types of Food Ingredients supra*.

25. The FDA's website also includes a page that provides a searchable inventory of "Substances Added to Food." On the page dedicated to citric acid, the FDA describes its uses – both antimicrobial and antioxidant – as a preservative:

FDA U.S. FOOD & DRUG ADMINISTRATION

## Substances Added to Food *(formerly EAFUS)*

FDA Home › Ingredients and Packaging › Food Ingredient and Packaging Inventories › Substances Added to Food *(formerly EAFUS)* › Original Search Results › CITRIC ACID

### CITRIC ACID

| | |
|---|---|
| **CAS Reg. No. (or other ID)*:** | 77-92-9 |
| **Substance*:** | CITRIC ACID |
| **Other Names:** | ♦ CITRIC ACID<br>♦ CITRIC ACID, ANHYDROUS<br>♦ 2-HYDROXY-1,2,3-PROPANETRICARBOXYLIC ACID<br>♦ BETA-HYDROXYTRICARBALLYLIC ACID<br>♦ 1,2,3-PROPANETRICARBOXYLIC ACID, 2-HYDROXY-<br>♦ ACIDE CITRIQUE |
| **Used for*† (Technical Effect):** | ANTIMICROBIAL AGENT,<br>ANTIOXIDANT,<br>ENZYME,<br>FLAVOR ENHANCER,<br>FLAVORING AGENT OR ADJUVANT,<br>LEAVENING AGENT,<br>PH CONTROL AGENT,<br>SEQUESTRANT,<br>SOLVENT OR VEHICLE,<br>SURFACE-ACTIVE AGENT |

*Substances Added to Food supra*.

26. In a document developed jointly by the FDA and the International Food Information Council Foundation, citric acid is identified as a preservative that "[p]revent[s] food spoilage from bacteria, molds fungi, or yeast (antimicrobials); slow[s] or prevent[s] change in color, flavor, or texture and delay[s] rancidity (antioxidant); [and] maintain[s] freshness." U.S. Food & Drug Admin. *Food Ingredients & Colors* at 2, https://www.fda.gov/files/food/published/Food-Ingredients-and-Colors-%28PDF%29.pdf (last visited Aug. 17, 2025).

27. The FDA has recognized citric acid as a preservative for some time. The FDA's classification of citric acid as a preservative was recognized, for example, in a 2010 Warning Letter sent to Chiquita Brands International, Inc. and Fresh Express, Inc. in which the FDA deemed the "Pineapple Bites" and "Pineapple Bites with Coconut" products "misbranded within the meaning of Section 403(k) of the [Federal Food and Drug Cosmetic] Act [21 U.S.C. 343(k)] in that they contain the chemical preservatives ascorbic acid and citric acid but their labels fail to declare these preservatives with a description of their functions." U.S. Food & Drug Admin., *Warning Letter to*

*Chiquita Brands Int'l, Inc. and Fresh Express, Inc.* (Oct. 6, 2010), *archived at* https://web.archive.org/web/20101109083452/http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/ucm228663.htm (emphasis added).

28. Food scientists likewise agree that the antioxidant and antimicrobial properties of citric acid make it a preservative. *See, e.g.*, Moon *et al., supra*; Su *et al. supra*.

29. As the images above show, each of the Products contain citric acid. Therefore, all of the Products contain a preservative.

**C. The Products' Citric Acid Is Artificial and Chemically Processed.**

30. Citric acid can occur naturally when obtained directly from citrus fruits. But that is not the case with the citric acid used in the Products.

31. More than 90% of all citric acid produced for commercial use – including that in the Products – is artificially produced using fermentation. Pau Loke Show *et al.*, *Overview of Citric Acid Production from* Aspergillus niger, Frontiers in Life Science (Apr. 20, 2015), https://www.tandfonline.com/doi/full/10.1080/21553769.2015.1033653#d1e252. And approximately 99% of that artificially produced citric acide is manufactured using fungus derived from a processed form of black mold, Iliana E. Sweis & Bryan C. Cressey, *Potential Role of the Common Food Additive Manufactured Citric Acid in Eliciting Significant Inflammatory Reactions Contributing to Serious Disease States: A Series of Four Case Reports*, 5 Toxicology Reports 808–12 (Aug. 2018), https://www.sciencedirect.com/science/article/pii/S2214750018300362?via%3Dihub ("Approximately 99% of the world's production of [manufactured citric acid] is carried out using the fungus *Aspergillus niger* since 1919."); *Chemical Safety Facts: Citric Acid*, American Chemistry Council (Oct. 14, 2022), https://www.chemicalsafetyfacts.org/chemicals/citric-acid/ ("Since the early 1900's, approximately 99 percent of the world's production of manufactured citric acid has been developed from black mold (the *Aspergillus niger* fungus.").

32. While many processes have been studied for the commercial synthesis of citric acid, "*Aspergillus niger* is superior to other microorganisms for the commercial synthesis of citric acid because of its better production yield." Show *et al. supra*.

33. In this synthetic industrial process, the mold is grown in fermentation tanks and fed carbohydrate sources such as glucose or corn-derived sugars. As it metabolizes these sugars, *A. niger* secretes citric acid into the surrounding liquid, which is then separated from the fungal biomass and purified through filtration, precipitation, and crystallization for use in foods and consumer products. Show *et al. supra*

34. Unlike the naturally occurring citric acid, manufactured citric acid ("MCA"), even though categorized as "generally recognized as safe" ("GRAS") has been reported to cause health problems. Dr. Iliana Sweis, for example, provided the following assessment of her findings in a peer-reviewed and widely cited report:

> *Aspergilus niger* is a known allergen. The FDA placed MCA under the category of GRAS without any research to substantiate this claim. In 2016, 2.3 million tons of MCA were produced, predominantly in China, and approximately 70% is used as a food or beverage additive. There have been no scientific studies performed to evaluate the safety of MCA when ingested in substantial amounts and with chronic exposure. We present four case reports of patients with a history of significant and repetitive <u>inflammatory reactions including respiratory symptoms, joint pain, irritable bowel symptoms, muscular pain and enervation</u> following ingestion of foods, beverages or vitamins containing MCA. We believe that ingestion of the MCA may lead to a harmful inflammatory cascade which manifests differently in different individuals based on their genetic predisposition and susceptibility, and that the use of MCA as an additive in consumable products warrants further studies to document its safety.

Sweis & Cressey *supra* (emphasis added).

35. As stated above, more than 90% of citric acid in food is artificially manufactured. Given this fact, it is not just "plausible" that the Products contain chemically produced citric acid – it is almost certain.

**D. The Subjective Intent of the Use of Citric Acid Is Immaterial.**

36. Citric acid has multiple inherent functions in food and beverages – preservative, acidulant, flavoring, and pH regulator. *See What is Citric Acid and How is it Used?*, Ingredi (Dec. 11, 2018), https://ingredi.com/blog/what-is-citric-acid-and-how-is-it-used-/?srsltid=AfmBOoonnC71j707-z6zMvgON8UHGqzI-LHke3cXR8twddMoyZXhpI7b (describing the multiple roles of citric acid in the food and beverage industry); *Substances Added to Food supra* (identifying citric acid's uses as including uses as an "antimicrobial agent, antioxidant, enzyme, flavor enhancer, flavoring agent or adjuvant, leavening agent, pH control agent, sequestrant, solvent or vehicle, [and] surface-active agent").

37. Regardless of the intended purpose or the purpose for which Defendant added citric acid to the Products, including as a flavoring agent, citric acid is still a preservative in the Products. *See* U.S. Dept. of Agriculture, *Technical Evaluation Report: Citric Acid and Salts* (Feb. 17, 2015), https://www.ams.usda.gov/sites/default/files/media/Citric%20Acid%20TR%202015.pdf (explaining that citric acid's chemistry gives it preservative properties, regardless of purpose); Zia Sherrell, *What is Citric Adid, and What is it Used for?*, Medical News Today, (Jun. 26, 2023), https://www.medicalnewstoday.com/articles/citric-acid ("In addition to providing flavor, [citric acid] also acts as a preservative.").

38. As stated above, federal regulations define a chemical preservative as "any chemical that, when added to food, tends to prevent or retard deterioration[.]" 21 C.F.R. § 101.22(a)(5) (2024); *see* U.S. Dept. of Agriculture, *Technical Evaluation Report*, *supra* at 19–20 (describing in the context of 21 CFR 101.22(a)(5) citric acid's preservative mechanisms). Thus, even if the citric acid in the Products does not in practice function as a preservative, it nonetheless qualifies as one because it tends to and has the inherent capacity or tendency to preserve food.

39. Consumers likewise understand the term "preservative" to mean an agent that has the ability to preserve food. For example, Merriam-Webster's Dictionary defines "preservative" as

"something that preserves or has the power of preserving." *Preservative*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/preservative (last visited Oct. 2, 2025).

**E. Defendant's Misrepresentation Exploits Consumers Demand for Preservative-Free Food.**

40. Defendant's misrepresentation of the Products as "Always baked without artificial colors, flavors & preservatives" is designed to exploit long-standing and well-documented consumer preferences for foods marketed as healthier and "free from" artificial preservatives.

41. Consumers place significant weight on such labeling, with surveys and industry studies consistently showing that preservative-free claims drive purchasing decisions because shoppers view these products as safer and more natural. Even industry-funded research, such as that conducted by the International Food Information Council, confirms that consumers are skeptical of foods containing preservatives. Accordingly, representations that a product contains "no artificial preservatives" are material and deliberately targeted to influence consumer behavior.

42. Consumer research from 2015, for example, demonstrates that health-related labeling – especially "free-from" claims – has shaped purchasing behavior and perceptions of product healthfulness:

> Foods bearing "free-from" claims are increasingly relevant to Americans, as they perceive the products as closely tied to health. New research from Mintel reveals that 84 percent of American consumers buy free-from foods because they are seeking out more natural or less processed foods. In fact, 43 percent of consumers agree that free-from foods are healthier than foods without a free-from claim, while another three in five believe the fewer ingredients a product has, the healthier it is (59 percent). Among the top claims free-from consumers deem most important are trans-fat-free (78 percent) and preservative-free (71 percent).

*84% of Americans Buy "Free-From" Foods Because They Believe Them to be More Natural or Less Processed*, Mintel (Sept. 3, 2015), https://www.mintel.com/press-centre/84-of-americans-buy-free-from-foods-because-they-believe-them-to-be-more-natural-or-less-processed/ (emphasis added).

43. A 2018 joint study by the Food Marketing Institute, an advocacy group for the food retail industry, and Label Insight, a food industry consumer intelligence company, found that "no preservatives" was the leading product packaging description that influenced consumer purchasing decisions:

## Packaging Descriptions That Impact Purchases

Shoppers were asked what descriptions that appear on product packaging influence their purchase decisions. As outlined below, there are many descriptions that shoppers claim to impact their purchase behavior.

| TOP TIER | | MID TIER | | BOTTOM TIER | |
|---|---|---|---|---|---|
| No preservatives | 42% | Organic/Certified organic | 27% | No allergens | 19% |
| High protein | 39% | Low carbs | 27% | Delicious taste/Experience | 18% |
| No added hormones | 39% | No/Low fat | 26$ | Gluten-free | 18% |
| Low sugar | 38% | Vitamin-enriched | 25% | Pasture-raised | 17% |
| Low sodium | 38% | Cage-free | 24% | Certified Humane | 16% |
| Free from artificial flavors | 37% | Local | 24% | Fair Trade | 15% |
| Whole grains | 35% | Grass-fed | 24% | Calcium-fortified | 14% |
| No trans fats | 34% | Free-range | 23% | Sustainable | 14% |
| Non-GMO | 34% | No HFCS (high fructose corn syrup) | 23% | Clean label | 12% |
| Free from artificial colors | 34% | Reduces risk of heart disease/ Heart healthy | 23% | Contains dairy | 12% |
| High fiber | 34% | Low/Lowers cholesterol | 22% | Contains nuts | 11% |
| Antibiotic-free | 33% | Antioxidant-rich | 21% | New and improved | 10% |
| Natural | 31% | | | Kosher | 9% |
| Healthy | 31% | | | Vegan | 8% |
| Low calorie | 30% | | | Halal | 3% |

*The Transparency Imperative: Product Labeling from the Consumer Perspective, Food Marketing Institute & Label Insight* (2018) at 26, https://packaginginnovationportal.com/wp-content/uploads/2022/01/2018-FMI-LI-Transparency-Imperative-Report.pdf (last visited Oct. 3, 2025).

44. A 2019 Wakefield Research study showed that "more than half of shoppers (51%) were also swayed by "*no preservatives*," particularly older generations." Mary Ellen Shoup, *Label Insight Survey Reveals Loosely-Defined Claims Such as 'Natural' Still Have Pull with Consumers*, Food Navigator USA, (Mar. 28, 2019), https://www.foodnavigator-

usa.com/Article/2019/03/28/Label-Insight-survey-reveals-loosely-defined-claims-such-as-natural-still-have-pull-with-consumers/.

45. In the 2023 Food and Health Survey conducted by the International Food Information Council, an industry-funded nonprofit that promotes research and messaging aligned with the interests of major food and beverage companies, the second highest factor informing consumers about the safety of the food they purchase is a label on the food stating that it contains no artificial ingredients or colors:




*2023 Food and Health Survey*, International Food Information Council (May 23, 2023) at 73, https://ific.org/wp-content/uploads/2025/04/IFIC-2023-Food-Health-Report.pdf.

46. Further, a separate 2023 study by the International Food Information Council found that most people ranked foods containing preservatives as unhealthy if consumed or unsure about its healthfulness. *Public Attitudes Around Food Ingredients*, International Food Information Council (May 2023) at 10-11, https://ific.org/wp-content/uploads/2025/04/2023-Food-Ingredient-Survey.pdf.

47. The trend toward health-driven food choices remains strong in 2025, with industry observers acknowledging that "all natural, no artificial flavors, colors, or preservatives" are no longer passing fads but baseline expectations for consumers. *See* Kelly Beaton, *The Specialty Shift: Health, Premiumization, Value Will Share 2025*, (Feb. 12, 2025), https://foodinstitute.com/focus/the-specialty-shift-health-premiumization-value-will-shape-2025/.

48. A June 2025 study by PricewaterhouseCoopers ("PwC") on consumer food preferences found, for example, that 25% of consumers were "extremely concerned," 32% were "very concerned," and 32% were "somewhat concerned" about the levels of additives or preservatives in their food. *PwC's Voice of the Consumer 2025: A New Recipe for the Food Industry*, PwC (Jun. 10, 2025), https://www.pwc.com/gx/en/issues/c-suite-insights/voice-of-the-consumer-survey.html.

49. This evidence underscores that Defendant's representations that the Products are "Always baked without artificial colors, flavors & preservatives" are not incidental marketing puffery, but material claims that directly target health-conscious consumers and materially influence purchasing decisions.

50. Empirical evidence shows that consumers are consistently willing to pay a premium for healthier food. A 2022 review of 26 different experiments, for example, found that in 88.5% of experiments, "consumers would pay a 5.6% to 91.5% (mean 30.7%) price premium for healthier foods." *See* Moosa Alsubhi *et al.*, *Consumer Willingness to Pay for Healthier Food Products: A Systematic Review*, National Library of Medicine, (Nov. 7, 2022), https://pmc.ncbi.nlm.nih.gov/articles/PMC10909406/.

*51.* Industry insiders have also reported similar findings. For example, consumer research by Ingredion, an "ingredient solutions" company, found 74% of survey consumers would pay more for food that has no artificial ingredients – 24% would pay 5% more, 22% would pay

10% more, 16% would pay 20% more, and 12% would pay 30% or more. *See Maximize Brand Value by Formulating to 2024 Consumer Food Preferences*, Ingredion (2024), https://www.ingredion.com/na/en-us/be-whats-next/2023-consumer-food-preference-trends (last visited Oct. 3, 2025).

52. Plaintiffs and the other potential class members suffered harm from Defendant's misleading and deceptive practices in labeling the Products as "Always baked without artificial colors, flavors & preservatives." Plaintiffs and the other potential class members paid more for the Products than they would have if they had known that the Products were made with the chemical preservative citric acid.

**CLASS ACTION ALLEGATIONS**

53. Plaintiffs seek to represent a class defined as all persons in the United States who, during the applicable statute of limitations period, purchased Defendant's Products (the "Class").

54. Plaintiffs seek to represent a subclass defined as all Class members who reside in New York who purchased the Products (the "New York Subclass") (together, with the Class, the "Classes").

55. Members of the Classes are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Class number in the hundreds of thousands. The precise number of Class members and their identities are unknown to Plaintiffs at this time but may be determined through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

56. Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to, the nature and presence of artificial preservatives in the Products; whether the marketing, advertising, packaging, labeling, and other promotional materials for the

Products are deceptive; whether Plaintiffs and the members of the Classes paid more for the Products than they would have knowing the Products contained the artificial preservative citric acid and, if so, how much more was paid; and whether Plaintiffs and the members of the Classes are entitled to attorneys' fees and costs.

57. The claims of the named Plaintiffs are typical of the claims of the Class in that the named Plaintiffs were exposed to Defendant's false and misleading marketing, purchased Defendant's Products, and suffered a loss as a result of those purchases.

58. Plaintiffs are adequate representative of the Classes because their interests do not conflict with the interests of the Class members they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously. The interests of Class members will be fairly and adequately protected by their counsel.

59. The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members. Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## CAUSES OF ACTION

**COUNT I: Violation of New York General Business Law Section 349**
**(On behalf of the New York Subclass)**

60. Plaintiffs incorporate by reference and realleges the allegations contained in Paragraphs 1 through 59 above as if fully set forth herein.

61. Plaintiffs bring this cause of action on behalf of themselves and on behalf of members of the New York Subclass against Defendant.

62. New York General Business Law ("NY GBL") Section 349 provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce are unlawful."

63. Plaintiffs and the New York Subclass members are persons within the meaning of NY GBL Section 349(h).

64. Defendant is a "person, firm, corporation or association or agent or employee thereof" within the meaning of NY GBL 349(b).

65. Defendant made false and misleading statements by marketing the Products, in both advertising and on the packaging of the Products, as "Always baked without artificial colors, flavors & preservatives" when the Products did contain citric acid, which is an artificial preservative.

66. Defendant's statement that the Products are "Always baked without artificial colors, flavors & preservatives" was misleading in a material way because the statement was likely to mislead a reasonable consumer, and in fact did mislead Plaintiffs and the members of the New York Subclass to believe the Products were free from artificial preservatives.

67. Defendant's statement that the Products are "Always baked without artificial colors, flavors & preservatives" was directed at Plaintiffs and the members of the New York Subclass.

68. Plaintiffs and New York Subclass members suffered ascertainable loss as a direct and proximate result of Defendant's misrepresentations in that (a) they would not have

purchased the Products had they known the truth, and (b) they overpaid for the Products on account of the "Always baked without artificial colors, flavors & preservatives" misrepresentation.

69. On behalf of themselves and other members of the New York Subclass, Plaintiffs seek to enjoin Defendant's unlawful acts and practices described herein, to recover their actual damages or $50, whichever is greater, reasonable attorney's fees and costs, and any other just and proper relief available.

**COUNT II: Violation of New York General Business Law Section 350**
**(On behalf of the New York Subclass)**

70. Plaintiffs incorporate by reference and realleges the allegations contained in Paragraphs 1 through 59 above as if fully set forth herein.

71. Plaintiffs bring this cause of action on behalf of themselves and on behalf of members of the New York Subclass against Defendant.

72. NY GBL provides that "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

73. Defendant's labeling and advertisement of the Products was false and misleading because Defendant identified the Products as "Always baked without artificial colors, flavors & preservatives" when the Products did contain citric acid which is an artificial preservative.

74. Defendant's statement that the Products are "Always baked without artificial colors, flavors & preservatives" was misleading in a material way because the statement was likely to mislead a reasonable consumer, and in fact did mislead Plaintiffs and the members of the New York Subclass to believe the Products were free from artificial preservatives.

75. Defendant's statement that the Products are "Always baked without artificial colors, flavors & preservatives" was directed at Plaintiffs and the members of the New York Subclass.

76. Plaintiffs and New York Subclass members suffered ascertainable loss as a direct and proximate result of Defendant's misrepresentations in that (a) they would not have purchased the Products had they known the truth, and (b) they overpaid for the Products on account of the "Always baked without artificial colors, flavors & preservatives" misrepresentation.

77. On behalf of themselves and other members of the New York Subclass, Plaintiffs seek to enjoin Defendant's unlawful acts and practices described herein, to recover their actual damages or $50, whichever is greater, reasonable attorney's fees and costs, and any other just and proper relief available.

**COUNT III: Breach of Express Warranty**
**(On behalf of the Classes)**

78. Plaintiffs incorporate by reference and realleges the allegations contained in Paragraphs 1 through 59 above as if fully set forth herein.

79. Plaintiffs bring this cause of action on behalf of themselves and on behalf of members of the Classes against Defendant.

80. Defendant, as the producer, marketer, distributor, and/or seller, expressly warranted that the Products are "Always baked without artificial colors, flavors & preservatives."

81. Defendant's representations and warranties were part of the description of the goods and the bargain upon which the Products were offered for sale and purchased by Plaintiffs and members of the Classes.

82. The Products do not conform to Defendant's representations and warranties because the Products contain citric acid, an artificial preservative.

83. By falsely representing the Products in this way, Defendant breached its express warranty.

84. As a direct and proximate cause of Defendant's breach of express warranty, Plaintiffs and members of the Classes have been injured and harmed in an amount to be proven at trial because they would not have purchased the Products, or would have paid substantially less for them, had they known they contained an artificial preservative.

85. On October 20, 2025, counsel for Plaintiffs sent letters to Defendant's principal business address in Horsham, Pennsylvania via FedEx stating that the Plaintiffs had purchased the Products multiple times, had relied on the statement that the Products were "Always baked without artificial colors, flavors & preservatives," and considered the use of artificial citric acid to be a breach of that statement. These letters were delivered on October 22, 2025. As of the filing of this Complaint, no response to these letters has been received.

**<u>COUNT IV: Unjust Enrichment</u>**
**(In the Alternative)**

86. Plaintiffs incorporate by reference and realleges the allegations contained in Paragraphs 1 through 59 above as if fully set forth herein.

87. Plaintiffs bring this cause of action on behalf of themselves and on behalf of members of the Classes against Defendant.

88. Plaintiffs and Class members conferred benefits on Defendant by paying money to Defendant for the purchase of the Products.

89. Defendant has knowledge of such benefits.

90. Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff's and Class members' purchase of the Products. Retention of those moneys under these circumstances is unjust and inequitable because Defendant misrepresented that the Products are "Always baked without artificial colors, flavors & preservatives" when in fact they contain citric acid, a known artificial preservative.

91. Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiffs and Class members is unjust and inequitable, Defendant must pay restitution to Plaintiffs and the Class members as ordered by the Court.

**PRAYER FOR RELIEF**

WHEREFORE Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a. For an order certifying the Class and New York Subclass under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiffs as representatives of the Class and New York Subclass, and naming Plaintiff's attorneys as Class Counsel to represent the Class and New York Subclass;

b. For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

c. For compensatory and statutory damages in amounts to be determined by the Court and/or jury;

d. For prejudgment interest on all amounts awarded;

e. For an order of restitution and all other forms of equitable monetary relief;

f. For an order enjoining Defendant from continuing the illegal practices detailed herein and compelling Defendant to undertake a corrective advertising campaign; and

g. For an order awarding reasonable attorneys' fees and expenses and costs of suit.

**DEMAND FOR TRIAL BY JURY**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable as of right.

Dated: 11/17/2025
New York, New York

Respectfully submitted,

By: *Mari K. Bonthuis*

Mari K. Bonthuis
Jennifer Kraus-Czeisler
Todd McClelland (*pro hac vice* to be submitted)
Sterlington, PLLC
228 Park Avenue South, No. 97956
New York, New York 10003
(212) 433-2834
(212) 457-9571
mari.bonthuis@sterlingtonlaw.com
jen.czeisler@sterlingtonlaw.com
todd.mcclelland@sterlingtonlaw.com

Don Bivnes (*pro hac vice* to be submitted)
Don Bivens, PLLC
15169 N. Scottsdale Road, Suite 205
Scottsdale, Arizona 85254
602-762-2661
don@donbivens.com

*Attorneys for Plaintiffs Jessica Pardo and Sthorm Pyrane*